UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT OWENSBORO
CIVIL ACTION NO. 4:06-CV-P107-M

JAMES R. HAZELWOOD                                    PLAINTIFF

v.

PATTI WEBB *et al.*                                    DEFENDANTS

### MEMORANDUM OPINION

This matter is before the Court on the parties' cross motions for summary judgment. Fully briefed, the motions are ripe for decision.  For the reasons set forth below, the Court will grant Defendants Webb, Basham, Banks, and Frailley summary judgment, deny Defendants Mason and Adkins summary judgment, and deny Plaintiff's motion for summary judgment.

### I. FACTS

Plaintiff filed this civil rights action against various officials at the Green River Correctional Complex (hereinafter "GRCC") in Central City, Kentucky.  Specifically, Plaintiff sued Warden Patti Webb, Officer Debra Banks, Officer David Frailley, Officer Frederick Basham, and Officer Shawn Mason.  Plaintiff alleges that Defendants violated his Eighth Amendment rights by failing to protect him from assault by a fellow prisoner.

On or about December 16, 2005, Plaintiff was transferred to GRCC.  Plaintiff had previously worked as a prison legal aide.  Thus, shortly after his arrival at GRCC Plaintiff was assigned legal aide duty at GRCC in the inmate law library.  One of Plaintiff's assigned duties in the law library was to retrieve regular shipments of legal books from the University of Kentucky College of Law ("U.K.") and shelve the books in the library.  In the course of performing these duties, Plaintiff determined that 1) the shipments were not inspected by prison officials prior to being sent to the law library; and 2) the prison did not have any standards that required Plaintiff

to dispose of the boxes in any particular manner.

About two or three weeks after being assigned to the law library, Plaintiff was approached by two other prisoners, J.H. and M.A. They explained to Plaintiff that prisoners at the Kentucky State Penitentiary had used the inter-library loan system to smuggle drugs into the prison and inquired whether Plaintiff thought a similar scheme might work at GRCC. Plaintiff responded that he had a better idea. He thought that they could take the labels off of the U.K. book shipments and use them to smuggle drugs into GRCC. Thereafter, Plaintiff disposed of the boxes in a manner that allowed inmate M.A. to remove the U.K. labels from the boxes. Then inmate J.H. mailed the labels to his family and friends so that they could stick the labels on their own boxes, put drugs in hollowed out books, and send them to GRCC disguised as shipments from U.K. Plaintiff also advised two other inmates, J.F. and B.A., of this scheme. Independently, they also agreed to smuggle drugs into the prison with Plaintiff's assistance. The two sets of prisoners were ignorant of one another's existence. Plaintiff was the only one aware that there were two identical schemes being run simultaneously.

On February 27, 2006, and March 3, 2006, the boxes of drugs were received at the GRCC mail room. The boxes were intercepted by Internal Affairs who removed the marijuana, replaced it with tobacco, and allowed it to run its course in an effort to determine its source. The exact source, however, was not determined at that time.

On March 2, 2006, Plaintiff was placed in administrative segregation at GRCC, otherwise referred to as the Special Management Unit (hereinafter "SMU") pending an investigation by Defendant Basham. The investigation of Plaintiff on March 3, 2006, concerned possible misconduct on Plaintiff's part in relation to his prison file and his alleged unauthorized access

and removal of detainer information.  Initially, it had nothing to do with the drug smuggling scheme.  Plaintiff was given *Miranda* Rights and questioning began as to the file incident. However, Plaintiff apparently perceived this interrogation to be in relation to his involvement in the drug smuggling operation.  As a result, Plaintiff began to give explicit details on this criminal conspiracy, including his and others' involvement.  He also offered to become a confidential informant.

Plaintiff was told specifically by Defendant Basham that he would not be asked to place his personal well-being in jeopardy.  He was also informed that he would not be given any favors or special treatment for his cooperation.  Plaintiff responded that he had been locked up for many years and was not worried about being in any kind of danger.  Given Plaintiff's reassurance that his safety was not at risk and there being no evidence to support a contrary conclusion, Defendant Basham contacted Defendant Webb for approval to release Plaintiff back into the general population.  This request was granted.  At this time, there was no known information that Plaintiff faced a particular threat or that any prisoners were aware that Plaintiff had agreed to become a confidential informant.

On March 16, 2006, Plaintiff was interrogated by Defendants Basham and Banks in the strip search room outside of the GRCC property room.  The purpose of this interrogation was to discuss discrepancies in Plaintiff's story and issues concerning the physical evidence.  During the March 16, 2006 meeting, Defendants Banks and Basham witnessed the presence of several inmates in the property room who may have been within earshot of the conversation with Plaintiff.  As a result, Plaintiff was placed in SMU for his own safety pending an investigation

into whether or not any inmate overheard the conversation.[1]  The following day of March 17,

2006, Plaintiff was again questioned about the packages and was asked if he would take a

polygraph.  At this juncture, Plaintiff fully disclosed all participants in the scheme.[2]  It was at

this time that Plaintiff requested to be returned to the general population.  Citing again his prison

experience and the fact that two of the inmates Plaintiff had given information about were in

SMU themselves, Plaintiff stated that he felt safe returning to the general population.  Plaintiff,

however, remained in SMU pending a determination of whether his status had been

compromised the previous day.

On March 20, 2006, Defendants Banks and Basham concluded the investigation into the

matter of Plaintiff's possible exposure as an informant.  It was determined that there was no

evidence to support such a conclusion and that no one had received any information to indicate

that Plaintiff's informant status had been compromised.  Again, Plaintiff specifically requested to

be released into the general population and stated that, "my life could not be in danger."

Plaintiff's request was discussed with Defendant Webb and prior to granting Plaintiff's wish,

Defendant Basham informed Plaintiff that there would be no conflict sheets placed in his record

concerning the other inmates as this could possibly be seen and thus compromise Plaintiff's

status.  Plaintiff was further informed that Defendants could not guarantee his safety and that

was why he was being offered protective custody.  Defendants also informed Plaintiff that if at

anytime he felt threatened or endangered he could immediately request from any staff member to

---

[1]Outside of participating in the Internal Affairs investigations directly dealing with the importation of drugs, this was Defendant Banks' only involvement.

[2]He had previously only divulged the existence of one set of inmates involved in the drug smuggling scheme.

4

be placed into protective custody and that request would be granted.  Plaintiff refused protective custody and signed a written waiver.

The inmates identified by Plaintiff as participants in the drug smuggling operation were disciplined along with Plaintiff.  Plaintiff alleges that Defendants Basham and Frailley deliberately and knowingly exposed Plaintiff during the disciplinary proceedings because the disciplinary reports by them depicted Plaintiff as "receiving the marijuana in the library." Plaintiff also alleges that Defendant Frailley further exposed Plaintiff by stating that the books were to be received by a "legal aide."  Despite Plaintiff's awareness of these statements, however, he did not request to be placed in protective custody at that time.

Plaintiff also alleges that he was not informed by Defendants that one of the prisoners he provided information about was released from SMU in late May.  However, Plaintiff observed the inmate in the general population.  Still, he did not request protective custody at that time.

On June 4, 2006, inmate Lawan Allison, a barber at GRCC, was giving an inmate in the SMU unit a haircut.  The inmate requested inmate Allison to "tell the little short black barber[3] I said what's up!"  On June 6, 2006, Allison informed Plaintiff of the message and inquired: "what's going on?  are you okay?"  Believing that the message was a threat, later that same day after finishing up in the barber shop, Plaintiff alleges that he reported his fears to Defendants Mason and Adkins.  Plaintiff further alleges that instead of removing Plaintiff from the general population at that time, they told Plaintiff to go see his caseworker, Kevin Swift, who had no responsibility for security.  Defendants Adkins and Mason deny receiving the report.  They do,

---

[3]By this time, Plaintiff had apparently been relieved of his duties in the prison law library and assigned to work as a prison barber.

5

however, admit they were on duty at the time.  Additionally, Defendant Basham admits that he

was on vacation at the time.  The next morning at 8:30 a.m., Plaintiff was assaulted by another

inmate.  Plaintiff was later told that this assault was a "paid hit" and retribution for his informing

on other inmates.  After the assault, Plaintiff was permanently removed from the general

population.

## II.  STANDARD OF REVIEW

In order to grant a motion for summary judgment, the Court must find that the pleadings,

together with the depositions, interrogatories, and affidavits, establish that there is no genuine

issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R.

Civ. P. 56.  The moving party bears the initial burden of specifying the basis for its motion and

of identifying that portion of the record which demonstrates the absence of a genuine issue of

material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Once the moving party

satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating

a genuine issue of fact for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

Although the Court must review the evidence in the light most favorable to the

non-moving party, the non-moving party is required to do more than show there is some

"metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio

Corp.*, 475 U.S. 574, 586 (1986).  The Rule requires the non-moving party to present "specific

facts showing there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  "The mere existence of a

scintilla of evidence in support of the [non-moving party's] position will be insufficient; there

must be evidence on which the jury could reasonably find for the [non-moving party]."

*Anderson*, 477 U.S. at 252.

6

### III.  ANALYSIS

To be certain, "prisons are necessarily dangerous places; they house society's most antisocial and violent people in close proximity with one another."  *Farmer v. Brennan*, 511 U.S. 825, 858 (1994) (Thomas, J. concurring).  As a result, some level of violence can be unavoidable no matter what precautions are taken, and officers cannot be expected to prevent every assault before it occurs or to stop an assault in progress before injuries are inflicted.  As a general principle, a prison guard only has the duty to ensure the "reasonable safety" of inmates. *See id.*  A prison official is liable for failing to protect an inmate from assaults by other inmates when a plaintiff proves the following:  "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id.* at 837.  That awareness can be demonstrated through "inference from circumstantial evidence," and a prison official cannot "escape liability . . . by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault."  *Id.* at 842-43.

### A.      Defendants Webb, Basham and Banks

The Court concludes that for the purposes of summary judgment Defendants Webb, Basham and Banks acted reasonably based on the knowledge available to them under the circumstances.  There was no specific threat against Plaintiff at the time Defendant Webb approved his release back into the general population; Plaintiff had been offered protective custody by Defendant Basham; Plaintiff voluntarily waived protective custody; Plaintiff stated

that he did not feel threatened upon returning to the general population; there was no specific information to support a conclusion that Plaintiff's status had been compromised; and Plaintiff was instructed that if he felt threatened at any time he could report it and be placed into protective custody.  These Defendants took appropriate actions to protect Plaintiff.  The only fact that these Defendants knew concerning a risk of threat to Plaintiff's safety was his status as a confidential informant.[4]  However, at the times Plaintiff was released into the general population there was no reason to believe that Plaintiff's status had been compromised or that a specific threat had been made against him.  Plaintiff essentially argues that Defendants should have forced him to involuntarily enter protective custody even before he received a specific threat against his life.  Such a requirement goes too far.  Based on information known to them, these Defendants acted appropriately.

**B.      Defendant Frailley**

Plaintiff's central complaint against Defendant Frailley appears to center around the actions he took in disciplining the other prisoners on whom Plaintiff informed.  Defendant Frailley, however, did not name Plaintiff by name.  He did, however, have to identify enough information about the alleged schemes to place the disciplinary proceedings in context.  Most telling, however, is that fact that after the proceedings Plaintiff voluntarily remained in the general population.  If Plaintiff felt threatened as a result of Defendant Frailley's statements in the disciplinary proceedings, as instructed by Defendant Basham, Plaintiff was free to request

---

[4]The one time that Defendants became concerned that Plaintiff's status might have been compromised they took immediate action to protect Plaintiff.  An investigation was immediately conducted.  Even though the results of the investigation were negative, Plaintiff was still offered protective custody.

protective custody.  He did not do so.  Defendant Frailley is entitled to summary judgment.

## C.    Defendants Mason and Adkins

Accordingly to Plaintiff, as soon as he received the threat as conveyed to him from inmate Allison, he reported it to Defendants Mason and Adkins.  While Defendants Mason and Adkins deny that such a report was made, for the purposes of summary judgment the Court presumes that Plaintiff made the report.  According to Plaintiff, instead of taking immediate action, these Defendants advised Plaintiff to see his caseworker.  Based on Defendant Basham's instructions to Plaintiff and Plaintiff's known status as a confidential informant, the Court cannot conclude that Defendants Basham and Mason acted reasonably under the circumstances.  Once Plaintiff received what he believed was a concrete threat and given Plaintiff's status, it would seem that Plaintiff should have immediately been removed from the general prison population until the threat was evaluated.  Accordingly, Defendants Mason and Adkins are not entitled to summary judgment.  Additionally, because there are disputed issues of material fact with respect to the facts surrounding this claim (whether Plaintiff reported the threat, the nature of the threat, and whether the attack was over a bad hair cut or a paid hit), the Court will likewise deny Plaintiff summary judgment against these Defendants.  Rather, the Court will refer Plaintiff's claims against these remaining two Defendants to the Magistrate

Judge for a settlement conference.

The Court will enter appropriate Orders consistent with this Memorandum Opinion.

Date:

cc:     Plaintiff, *pro se*
        Counsel of Record

4414.008